**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

UNITED STATES OF AMERICA,

       Plaintiff,                                     Case No. 04-80170
                                                          Judge Avern Cohn

v.

HUEL LOCKLEAR,

       Defendant.

_____/

**MEMORANDUM AND ORDER DENYING DEFENDANT'S MOTION AND SUPPLEMENTAL MOTION FOR A JUDGMENT NOTWITHSTANDING THE VERDICT OR, IN THE ALTERNATIVE, FOR A NEW TRIAL**

**I. INTRODUCTION**

This is a criminal case. On March 22, 2007, following a jury trial, a jury found Defendant Huel Locklear (defendant) guilty of bank robbery in violation of 18 U.S.C. § 2113(a) (Count 1), and guilty of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1) (Count 2).

Before the Court are the defendant's motion and supplemental motion for a judgment notwithstanding the verdict under FED. R. CRIM. P. 29 or, in the alternative, for a new trial under FED. R. CRIM. P. 33. Defendant argues that the verdict is based on insufficient evidence because the government failed to establish that the bank robbery was committed through acts of intimidation, and failed to establish that the firearms specified in Count 2 were operable and not antique firearms. Defendant further argues that his due process rights and right to effective assistance of counsel were violated

1

because of the "late" production of discovery and because he was never provided with transcripts from the grand jury proceeding. Defendant requests an evidentiary hearing on these matters.

For the reasons that follow, defendant's motion and supplemental motion, are DENIED. The issues have been fully briefed by the parties, and an evidentiary hearing is not necessary.

## II. BACKGROUND[1]

A summary of the evidence presented at trial in the light most favorable to the government follows.

On December 24, 2003, at approximately 9:15 a.m., the Bank of Lenawee, located at 1701 W. Maumee, Adrian, Michigan was robbed by a masked individual. The robber entered the bank, jumped the teller counter and ordered people to get down. The robber took money from three (3) teller drawers and placed it into a blue laundry-type bag. The robber also demanded the opening of the vault, but left with the money from the teller drawers after being told that the vault could not be opened. The robber was seen entering the passenger side of a gray or dark colored station wagon that was waiting in the parking lot beside the bank.

Witnesses stated that the robber wore a dark colored ski-mask with openings for the eyes and mouth. The mouth area was covered with a piece of blue cloth; the robber

---

[1] The parties did not order a transcript. A transcript is not necessary as the defendant does not contest what evidence was admitted. Instead, his arguments regarding the sufficiency of evidence are based on evidence he says should have been presented. Moreover, the parties agree on the dates on which the government provided discovery and also agree that the government did not provide defendant with transcripts of the grand jury proceeding.

wore sunglasses underneath the ski-mask.  He also wore a green coat, a camouflage vest over the coat, solid green pants, brown jersey work gloves, and white sneakers with red trim.  Based on the small amount of skin not covered by the clothing, the robber was described as a light-skinned Black male or a dark-skinned White male.  One witness said the robber spoke with a slight Southern accent.

      Detective Jeffrey Labarr (Labarr) testified that officers responding to the robbery immediately began searching the area for the described get-away vehicle.  They found a Toyota Corolla station wagon (the Toyota) in a nearby parking complex.  Labarr explained that officers observed two sets of footprints in the snow near the Toyota.  One set was larger that the other set and contained a distinctive circular design on the sole of the shoe.  A witness told officers that a dark-haired African-American or Hispanic female left the parking lot driving a silver or white Lincoln Continental close to the time the bank robbery was completed.  Labarr testified that he returned to the bank and saw the same footprints with the distinctive circular design along the path the robber took to get to the get-away car.  The footprints at the bank and at the parking complex were photographed.

      Further investigation revealed that prior to the robbery the Toyota had been purchased by a petite Hispanic female who paid for it in cash.

      On January 11, 2004 Livonia police received an anonymous tip that Regina Locklear and a "Whowell" Locklear had been involved in a bank robbery, and drove a silver or white Lincoln with North Carolina license plates.  The tipper said that the couple had recently purchased a black Lincoln Continental and switched its plates for the plates of the other Lincoln.  The tipper also provided an address where the couple was

3

staying. Livonia police officers went to the address and pulled over Regina Locklear (Regina) who was driving away from the address in a black Lincoln. Victoria Page (a friend of Regina's daughter) was a passenger in the car. Regina was arrested on outstanding warrants, Mirandized, and interviewed by the officers. Page was not arrested and she went to Regina's parents house.

During the interview Regina stated that her boyfriend, Larry Huel Locklear robbed the bank and that she was the get-away driver. Regina stated that she and the defendant resided in North Carolina. She stated that in the early part of November or December of 2003 she and the defendant drove up to Michigan to visit her children. During their stay defendant spotted a 1982 Toyota Corolla station wagon that he wanted to buy. Defendant gave Regina money to purchase it, which she did. Regina and the defendant returned to North Carolina leaving the Toyota in Michigan.

Regina stated that a few days before Christmas she and the defendant returned to Michigan. They drove in a silver Lincoln Town Car bearing North Carolina license plates. The defendant told Regina that he wanted to purchase another car to take back to North Carolina and that he wanted Regina to drive the newly purchased car back. The day before the robbery the defendant and Regina went to Buddie Howard's home to purchase a black Lincoln, however Howard was leaving for Florida and was unable to complete the transaction. Apparently, the transaction was completed at a later date.

The morning of the robbery, the defendant told Regina that he was going to get registration tags for the Toyota. They drove in the silver Lincoln to a parking complex where the Toyota was parked. The defendant told Regina to drive the Toyota and he got into the passenger side. As they left the parking lot, Regina noticed that defendant

had a .357 handgun. As they neared the bank, the defendant told Regina to pull into the bank parking lot which was located along the side of the bank. He instructed her to wait there. When Regina asked the defendant what he was going to do, he told her that he was going to go inside and take care of business. Regina says that while he spoke, the defendant motioned with the gun in a threatening manner and she was fearful that he would hurt her if she did not comply, so she parked the Toyota. Defendant entered the bank and a few moments later, he returned to the Toyota. Regina stated that the defendant looked "fuller", as if he had something inside his coat. The defendant instructed Regina to return to the parking lot where the silver Lincoln was parked. Regina complied and they left the parking lot in the Lincoln. Regina stated that she asked the defendant if he had robbed the bank and the defendant told her not to question him or that she would be in danger.

Later, Regina also told the officers that the defendant was at her parent's home in Onstead, Michigan and that he had with him at least the .357 handgun. Deputies from the Lenawee County Sheriff's Department were the first dispatched to Regina's parents home. As they pulled up to the house, they saw defendant pulling out of the driveway in a silver Lincoln. Page (who had gone to Regina's parent's house after Regina's arrest) was a passenger. When one of the deputies activated his overhead lights the defendant bolted out of the driver's seat and ran into the woods. Defendant was apprehended later that night near Regina's parent's house.

The officers seized the silver Lincoln after the defendant fled from it. Page asked to retrieve her belonging from the trunk of the Lincoln. When officers opened the truck, they noticed a red and white tennis shoe with the same circular pattern on the sole as

5

those found in the snow by the bank and the parking complex where the Toyota was parked after the robbery.  The officers obtained a search warrant for the trunk and seized three handguns (including a .357), one rifle, bullets, a green ski mask with a blue piece of cloth safety-pinned over the mouth opening, a camouflage vest, a green military coverall flight suit, two pairs of goggle-like sunglasses, a green trench coat, several pairs of gloves, a red and white pair of Nike tennis shoes, a turquoise laundry bag, and mail address to the defendant.  The clothing found in the trunk matched the witnesses description of the clothing worn by the bank robber.  The circular pattern on the sole of the Nike shoes matched the footprints found at the bank and the parking complex after the robbery.  The defendant's DNA was found on the cloth safety pinned over the mouth of the ski mask.

### III. STANDARDS

#### A.  Judgment Notwithstanding the Verdict, FED. R. CRIM. P.  29

To prevail on his Rule 29 motion, the defendant must show that his conviction was based on insufficient evidence.  In assessing a challenge to the sufficiency of evidence, the relevant inquiry is "whether, after viewing the evidence in the light most favorable to the prosecution, <u>any</u> rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." <u>Jackson v. Virginia</u>, 443 U.S. 307, 319 (1979) (emphasis in original).  The Court must draw all available inferences and resolve issues of credibility in favor of the verdict.  <u>United States v. Jones</u>, 102 F.3d 804, 807 (6th Cir. 1996).  The Court does not weigh the evidence or assess witness credibility.  <u>United States v. Jackson</u>, 55 F.3d 1219, 1225 (6th Cir. 1995).

## B. Motion For New Trial, FED. R. CRIM. P. 33

Rule 33 permits the Court to "vacate any judgement and grant a new trial if the interest of justice so requires." The decision whether to grant a Rule 33 motion for a new trial lies within the Court's sound discretion. United States v. Davis, 15 F. 3d 526, 531 (6th Cir. 1994). "The defendant bears the burden of proving that a new trial should be granted." Id.

Under Rule 33, the task of the trial judge is to ascertain whether a verdict is against the manifest weight of the evidence. See Tibbs v. Florida, 457 U.S. 31, 42 (1982). A reversal based on the verdict being against the manifest weight of the evidence is proper when the government has presented sufficient evidence to convict, but the judge disagrees with the jury's resolution of conflicting evidence. Id. When considering a motion for new trial based upon the weight of the evidence, trial judges can act in the role of a "thirteenth juror" and consider the credibility of the witnesses and the weight of the evidence to insure that there is not a miscarriage of justice. United States v. Ashworth, 836 F.2d 260, 266 (6th Cir.1988).

## IV. ANALYSIS

### A. Sufficiency of the Evidence

#### 1. Bank Robbery

#### a. Elements of the Offense

18 U.S.C. § 2113(a) states that:

Whoever, by force and violence, or by intimidation, takes, or attempts to take, from the person or presence of another, or obtains or attempts to obtain by extortion any property or money or any other thing of value belonging to, or in the care, custody, control, management, or possession

of, any bank ... [s]hall be fined under this title or imprisoned not more than twenty years, or both.

In addition, 18 U.S.C. § 2113(f) requires that the deposits be insured by the Federal Deposit Insurance Corporation (FDIC).

### b. Argument

The parties stipulate that the deposits were insured by the FDIC. They also agree that the defendant did not use force or violence to commit the robbery. The defendant's argument is that the government failed to establish that the robbery was accomplished through the use of intimidation. The defendant states that the testimony presented at trial showed only that a heavily disguised individual entered the bank, vaulted teller window number one, opened three teller drawers, said "get down" and "open the vault" and then left with some money. The tellers did not get down or open any vaults. The defendant argues that these acts did not involve intimidation.

### c. Resolution

The evidence at trial is sufficient to sustain the conviction for bank robbery. There is no requirement that the tellers be put in fear, that a threat be made, or that a weapon be employed. Regarding proof of intimidation:

> [t]here must be conduct and words...calculated to create the impression that any resistance or defiance by the [teller] would be met by force and violence. Whether intimidation under 18 U.S.C. § 2113(a) exists in a particular case is determined by an objective test: whether an ordinary person in the teller's position could reasonably infer a threat of bodily harm from the defendant's act.

United States v. Gilmore, 282 F.3d 398, 402 (6th Cir. 2002).

Here, the tellers testified to the robber's manner of dress and the fact that he was heavily disguised, the fact that he jumped over the teller counter, shouted for everyone

8

to get down, took money from several teller drawers, and demanded that the vault be opened. Some witnesses testified that they were afraid and weren't sure what would happen if they resisted. Based on this evidence, the jury could reasonably infer that an ordinary person in the teller's position could reasonably infer a threat of bodily harm.

## 2. Possession of Weapon

### a. Elements of the Offense

To sustain a conviction for felon in possession of a firearm under 18 U.S.C. § 922(g)(1), the government must prove that (1) the defendant was convicted of a felony punishable by imprisonment for more than one year; (2) the defendant knowingly possessed the firearm specified in the indictment; (3) the firearm specified in the indictment traveled in or affected interstate commerce. United States v. Moreno, 933 F.2d 362, 372 n.1 (6th Cir. 1991).

### b. Argument

The defendant stipulates that he committed a prior felony and to the interstate nexus. He argues however, that the government did not prove that he possessed a firearm because it did not establish that the guns it said were firearms and introduced into evidence during the trial were in fact firearms under the statute. The defendant points out that the government did not present evidence that the guns could "expel a projectile by means of an explosive." Instead, the government presented evidence that the guns were found in the trunk of the silver Lincoln along with ammunition (i.e. bullets). The defendant asserts that the government's argument was that the finding of the ammunition in the same place as the guns was sufficient proof that the guns were

9

firearms. The defendant argues that this constitutes an amendment or variance to the indictment which broadened the basis for his conviction such that he was not really convicted for the offense he was charged with.

The defendant also argues that the government did not prove that the guns were not antiques. 18 U.S.C. § 921(a)(3) specifies that the term "firearm" does not include an antique firearm.

### c. Resolution

The government presented sufficient evidence to establish that the guns found in the defendant's trunk were firearms. Under 18 U.S.C. § 921(a)(3)(A):

> the term "firearm" means (A) any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive ... Such term does not include an antique firearm.

Under this definition, the government did not have to prove the operability of the charged weapons since an inoperable gun is still a firearm. See United States v. Yannott, 42 F.3d 999. 1006 (6th Cir. 1994)("[T]he filing down of the gun's hammer did not change the fact that the gun was designed to expel a projectile, but rather it merely temporarily altered the gun's capability).

Here there was ample evidence upon which the jury could properly assess whether the guns presented at trial were firearms that could expel or were designed to expel a projectile by the action of an explosive. First, there was testimony from LaBarr that loaded guns were collected from the trunk of the silver Lincoln that defendant abandoned. Moreover, the ammunition found was the type used in the guns found in the trunk. The fact that ammunition fitting the guns was found in the same place is

10

evidence that the guns were at least designed to expel a projectile.  Regina also testified that the defendant was armed with a .357 handgun during the robbery and also stated that defendant would be at her parent's home and in possession of the gun.  Next, the jury was able to view and examine the guns and ammunition.  Under these circumstances the jury could properly infer that the guns were firearms designed to fire a projectile by the action of an explosive.

Next, defendant's argument that the government did not prove that the guns were firearms because it did not present evidence that the guns were not antiques is meritless. The antique weapons exception is an affirmative defense which must be raised <u>before</u> the burden shifts to the government to disprove its applicability or else it is deemed waived.  <u>United States v. Smith</u>, 981 F.2d 887, 891-92 (6th Cir. 1992).  The defendant never raised this defense prior to or during trial and may not raise it now.

### B. Procedural Due Process and Ineffective Assistance of Counsel[2]

#### 1. The Government's "Late" Production of Discovery Material

#### a. Argument

The defendant says that the government's late submission of discovery materials violated his due process rights and right to effective assistance of counsel.  On March 8 and 9 of 2007, the government produced statements from individuals regarding the bank robbery investigations.  Defendant says the timing of this production was

---

[2] Defendant's ineffective assistance of counsel argument appears to be based entirely on the premise that because his counsel did not receive certain materials, or receive them in a timely fashion, the effectiveness of his assistance was compromised. Defendant does not argue under <u>Strickland v. Washington</u>, 466 U.S. 668 (1984).

prejudicial because this was less than one week before trial.

### b. Resolution

The defendant's argument is unavailing. Under Brady v. Maryland, 373 U.S. 83, 87 (1963), the government must turn over material favorable to a defendant and material to guilt or innocence. "[E]vidence is only material if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A reasonable probability' is a probability sufficient to undermine confidence in the outcome." United States v. Presser, 844 F.2d 1275, 1281 (6th Cir.1988). Here, while the government provided the investigation statements close to the trial date, they did disclose them. Thus, as a matter of law the government complied with Brady. Next, defendant's argument fails because he does not establish how or why he was prejudiced from the timing of the government's production. Defendant specifies no reason for why the outcome of his case would have been different had the government produced the documents at an earlier date.

### 2. The Government's Failure to Produce Grand Jury Transcripts

### a. Argument

The defendant points out that the government never provided him with the transcripts from the grand jury proceeding, which included statements of the tellers and customers taken immediately after the robbery. Defendant says he was prejudiced because his counsel had no idea who testified before the grand jury and whether exculpatory or impeaching evidence was available.

### b. Resolution

The government's failure to provide the defendant with the grand jury transcripts does not amount to a violation of the defendant's due process rights or right to effective assistance of counsel. A party seeking access to grand jury transcripts must show a particularized need for them. <u>Douglas Oil Co. of California v. Petrol Stops Northwest,</u> 441 U.S. 211, 217 (1979). A general claim that disclosure would reveal exculpatory evidence is not sufficient to satisfy the requirement of a showing of a particularized need. <u>United States v. Short</u>, 671 F.2d 178, 187 (6th Cir. 1982). Here, the defendant fails to make any argument as to why he believes the grand jury testimony includes exculpatory or impeaching evidence.

## V. CONCLUSION

Defendant's convictions on each of the charges was amply supported by the evidence, defendant's due process rights and right to effective assistance of counsel were not violated. Accordingly, the jury's verdict stands.

SO ORDERED.


Dated: June 15, 2007            s/Avern Cohn
                                           AVERN COHN
                                           UNITED STATES DISTRICT JUDGE

I hereby certify that a copy of the foregoing document was mailed to the parties of record on this date, June 15, 2007, by electronic and/or ordinary mail.

                                             s/Julie Owens
                                             Case Manager, (313) 234-5160